GLASGOW, Executor, *v.* LIPSE.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF VIRGINIA.

Argued March 3, 4, 1886.—Decided March 15, 1886.

Payment in good faith at its maturity in Virginia in Confederate currency of a debt contracted there in 1860 to be paid there in 1862, and the receipt and acceptance of the same by the creditor, discharged the debt.

In 1860 two brothers, executors of the will of their father, who had resided in Virginia, and had died there, contracted in that State to convey, under a power in the will, real estate of the testator on the payment, among other things, of a bond then executed by the purchaser for the payment of a sum of money in 1862. One of the executors resided in Indiana, and continued to reside there during and after the close of the war. The other received in Virginia in 1862 (by request of legatees under the will who accepted the same in payment of their distributive shares) payment of the bond in Confederate money, and accounted for the same to the court in 1864. In a suit commenced by the surviving executor against the executor of the obligor on the bond to recover payment of the bond: *Held*, That the payment to the resident executor in Confederate currency was a valid payment.

This was a bill in equity to set aside a deed made by Samuel Lipse, executor of Moses Lipse, and to obtain payment of a bond executed by Glasgow's testator in his lifetime. The case is stated in the opinion of the court. For the understanding of the points in the argument it is sufficient to say: That Moses Lipse died in Virginia before the war, leaving several children, among whom were David H. Lipse, residing in Indiana, and Samuel Lipse, residing in Virginia: Also leaving real estate and a will

empowering his executors to sell real estate, and naming David H. and Samuel as his executors, both of whom qualified : That in 1860 the executors agreed with one Spears, in Virginia, to convey a tract of testator's real estate on receiving among other things payment of a bond then executed by him to them for the payment of a sum of money in 1862 : That David continued to reside in Indiana during the war, and Samuel to reside in Virginia : That Spears' bond was paid to Samuel in Virginia in 1862, after its maturity, and Samuel presented his accounts in the proper court in 1864, showing receipt of such payment and division of the estate, which accounts were allowed and settled : That Samuel afterwards died, and David H. as surviving executor brought this suit against Spears' executor, to recover the sum alleged to be due on the bond, on the ground that the payment in Confederate currency was void.

Judgment below for the plaintiff, from which appeal was taken.

*Mr. Thomas J. Kirkpatrick* and *Mr. William J. Robertson* for appellant.

*Mr. John S. Wise* and *Mr. George W. Hansbrough* for appellee.

I. The *ex parte* settlement of the executors' accounts is no bar, even as to Lipse, the assistant executor, as against a debtor of the estate, who was no party to it ; *Butterfield* v. *Smith*, 101 U. S. 570 ; *Utterback* v. *Cooper*, 28 Gratt. 233, 270 ; certainly not as to the other executor, who was no party to it, who was beyond the jurisdiction, and a public enemy. No notice could be served upon him, and notice was necessary. *Underwood* v. *McVeigh*, 23 Gratt. 409 ; *Connolly* v. *Connolly*, 32 Gratt. 657 ; *Singleton* v. *Singleton*, 8 B. Mon. 340 ; *Gray* v. *Stuart*, 33 Gratt. 351. Virginia Code 1860, ch. 132, §§ 9, 14 *et seq.*

II. The land was sold for specie or its equivalent in currency of the United States. *Hibb* v. *Peyton*, 22 Gratt. 561. The terms of the sale in 1862 show that the payment of the debt due in 1861 was to be in gold, or notes redeemable in gold. See *Fretz* v. *Stover*, 22 Wall. 198 ; *McBurney* v. *Carson*, 99 U. S.

567. It was law in Virginia that a debt contracted before the war and payable in specie could not be discharged by payment in Confederate notes without the consent of the party to whom it was due; *Alley* v. *Rogers*, 19 Gratt. 366; *Fretz* v. *Stover*, above cited; *Purdie* v. *Jones*, 32 Gratt. 827; *Ewart* v. *Saunders*, 25 Gratt. 203; *Tosh* v. *Robertson*, 27 Gratt. 270; *Pilson* v. *Bushong*, 29 Gratt. 229; still more so when the dealing is with a fiduciary; *Patteson* v. *Bondurant*, 30 Gratt. 94; *Pinckard* v. *Woods*, 8 Gratt. 140; *Fisher* v. *Bassett*, 9 Leigh, 119; *Cocke* v. *Minor*, 25 Gratt. 246; *Jones* v. *Clarke*, 25 Gratt. 142. See also *Ward* v. *Smith*, 7 Wall. 447; *Fretz* v. *Stover*, and *McBurney* v. *Carson*, above cited.

III. The testator created in his two executors a joint power and trust to sell his lands, and divide the proceeds, and both qualified. This power related to the division of the proceeds as well as the sale of the land, and could not be executed by one so as to discharge the other and his bondsmen from liability for unlawful execution. In Virginia delegated authority must be strictly adhered to. *Johnston* v. *Thompson*, 5 Call, 248; *Deneale* v. *Morgan*, 5 Call, 407; *McCrae* v. *Farrow*, 4 Hen. & Munf. 444. The Virginia act of 1862, attempting to validate such transactions is unconstitutional. It comes within the rulings in *Edwards* v. *Kearzey*, 96 U. S. 595. See also *Horn* v. *Lockhart*, 17 Wall, 570; *Williams* v. *Bruffy*, 96 U. S. 176.

Mr. Justice Field delivered the opinion of the court.

This case comes before us from the Circuit Court of the United States for the Western District of Virginia. The facts out of which it arises are briefly as follows: In December, 1859, Moses Lipse, of Botetourt County, Virginia, died possessed of considerable property, real and personal, in that county, and leaving twelve children surviving him. His will, made a few days before his death, after providing for the payment of his debts, directed that all his property should be sold by his executors, and the proceeds be equally divided between his children and their representatives, certain sums advanced to them to be deducted from their respective portions. He appointed his sons, Samuel and David, executors. The will

was proved and admitted to record by the county court of the county at its May term of 1860, and in June following the executors qualified and gave a bond with sureties in the sum of $30,000.

In August of that year the executors sold the personal property, and on the 10th of September following the real property. The sale of the latter was made to Charles C. Spears, a citizen of Virginia, and the contract of sale was signed by the parties. The property was supposed at the time to consist of three hundred and seventy-one acres, but the quantity was to be definitely ascertained by an actual survey. The consideration agreed upon was thirty-eight dollars an acre, of which one third was to be paid on the 3d of October, and the balance in two equal annual instalments on the 3d of October, 1861, and on the 3d of October, 1862. For these deferred payments Spears was to give his bonds, and the executors agreed to place him in possession of the property by the following Christmas, and to make him a good title for the same when all the purchase money should be paid. The survey made disclosed a larger number of acres than was estimated, carrying the purchase price to $14,858. Of this sum Spears paid one third on October 3, 1860; and gave his two bonds for the balance as agreed.

Early in 1861 Spears joined the Confederate army, leaving his affairs in the hands of William A. Glasgow, of Botetourt County, as his agent, and during the year Glasgow, as such agent, paid the first bond, though not on the day of its maturity, but $3,000 at one time and the balance at another. Samuel Lipse, the resident executor of Moses Lipse, called upon Glasgow each time to collect the money, and in his accounts charged himself with the amount as of the day the bond was due.

The cash payment was made in lawful money, and there is no evidence that the first bond was otherwise paid. It is in proof that the notes of the Confederate States did not become generally current in Virginia until after this period. Of the money received on this bond and of other moneys in the hands of the resident executor, the distributive shares belonging to

nine of the twelve legatees, the number then residing within the Confederate States, were paid to them and received without objection. Three of the legatees, including the co-executor, resided in Indiana, and the shares belonging to them remained charged to the resident executor in his account, which was subsequently examined by the commissioner of accounts, reported to the court and approved.

Before the second bond became due, Spears was killed in battle. His will appointing Glasgow his executor was, at the November term of the county court in 1862, proved and admitted to record, and Glasgow qualified as executor.

When the second bond became due, or about that time, Glasgow called upon the resident executor and offered to pay it in Confederate notes; but the executor expressed some unwillingness to receive the payment then, and a desire before doing so to see some other persons, referring to the legatees. One witness testified that Glasgow at that time counted out the Confederate money, and that the executor replied that he would not take it, that it was of no account; but said that he would take Glasgow's check on the Fincastle Bank for the amount, observing, in the hearing of the witness, that he thought he could get Fincastle money for the check, that is, notes of the bank at that place. It is of little moment, however, whether the refusal of the Confederate notes was or was not accompanied by expressions as to their value. Twenty days afterward the resident executor called upon Glasgow at his office, and said that he was ready to receive payment of the balance due for the land, that he had seen most of the heirs, and that they wanted their money. Glasgow thereupon gave him a check for the balance on the Farmers' Bank at Fincastle, which was near by, and he accepted it without objection. He claimed nothing more than the principal, saying, that as Glasgow was ready to pay it when due, he ought not to pay interest. This check was deposited by the executor in the bank, and against its amount he subsequently drew his own checks. These were paid in Confederate notes. It does not appear, however, that any inducements were held out by Glasgow to the executor to take those notes in payment, or that any ignorance existed on

his part as to their true character, or that Glasgow made any representation as to the kind of currency in which the check should be paid, or that any complaint was made to him that the bank had paid it in those notes. As between Glasgow and the resident executor the transaction was considered closed. The last bond of Spears was paid, and, as the conditions of sale were complied with, the resident executor, in April, 1863, nearly six months afterwards, executed a deed of the land to Glasgow as executor of Spears' estate, reciting therein the entire payment of the purchase money to the executors of Lipse, deceased, "part by the said Spears in his lifetime, and the balance by the said Glasgow, his executor, since his death." The power to sell the land being vested in the two executors, their joint execution of the deed would have been necessary to transfer the title, had not the act of the legislature of Virginia of the 5th of March, 1863, provided that whenever any fiduciary residing in that State had been authorized to exercise any power, or to do any act jointly with one or more fiduciaries residing within the limits of the United States, (meaning thereby in those States without the limits of the Confederacy,) it should be lawful for the fiduciary resident in the State to exercise such power and do such act without the concurrence of the non-resident fiduciary, and that the act should have the same force and effect as if it was the joint action of all the fiduciaries. *McRae* v. *Farrow*, 4 Hen. & Munf. 444.

The resident executor at once proceeded to distribute the money received on this last bond. Eight of the legatees took their respective shares without objection; as did five of the six children of a deceased legatee. Soon afterwards the resident executor rendered his account, showing the disposition of the estate, the moneys received, the expenditures incurred, the debts discharged, and the payment of their respective shares to eight of the legatees and to five children of another legatee. The account examined by a commissioner appointed by the court was approved, and his report confirmed. Thus the estate was closed except as to the payment of the shares to the three legatees residing in Indiana, and the payment of the sixth part of the share of another legatee to one of his children. It is not

necessary to inquire as to the disposition made of these unpaid legacies, for the suit is not to compel their payment. It is said that the interests of two of them and of one of the children of the deceased legatee were confiscated under proceedings of the Confederate government. If such were the case it would not affect the validity of the payment of the last bond of Spears, nor of the settlement by the court of the resident executor's account previously rendered.

This settlement remained unquestioned from the confirmation of the commissioner's report, on November 14, 1864, until January 25, 1879, more than fourteen years, before this suit was instituted. Its object is to charge Glasgow, as executor of Spears, with the second and third instalments of the purchase-money of the land, and compel him, as executor, to pay the same, with interest, to David H. Lipse, the surviving executor of Moses Lipse, the resident executor having departed this life, and to cancel and set aside the deed conveying the land, executed by the latter to Glasgow, as above stated; and, if the instalments should not be paid by Glasgow, to have the land sold and the proceeds applied to their payment; the complaint alleging that those instalments never were paid, that Confederate notes were given in pretended payment, and were received under compulsion, with sundry charges of deceit and fraud on the part of Glasgow to carry out a scheme to obtain possession of the property without discharging the just claim of the estate thereon. None of these charges of deceit, fraud and compulsion are sustained by any evidence. On the contrary, the conduct of the resident executor and Glasgow is shown to have been that of honorable and just men; no deceit was practised, nor any undue advantage taken by either of them.

It is undoubtedly true that an executor is chargeable with the utmost good faith in dealing with the estate intrusted to him. He cannot wantonly neglect the property or squander it by useless expenditures, or suffer it to go to waste without incurring personal liability for the consequent depreciation. Nor can he call in good investments when the money is not needed, nor accept the payment of debts for less than their face when the full amount can be recovered without unnecessary delay

and expense, nor in depreciated currency when better currency can be had, unless it can be advantageously used in meeting expenses, discharging debts, paying legacies, and the like. In all such cases he would be chargeable with a devastavit. He may, however, take payment of a debt, when not secured, in the best money he can get, when its safety requires its collection. Under these limitations he must do what, under the circumstances and situation, prudent men, managing their own estates, would do; and, when doubting, seek the authority and direction of the proper court. With respect to transactions during the late war, he could not under any circumstances invest in Confederate securities property or lawful money already in his hands. *Horn* v. *Lockport*, 17 Wall. 570, 573; *Lamar* v. *Micou*, 112 U. S. 452, 476.

If he fail in the discharge of his trust he is liable to parties injured thereby, as all trustees are liable in such cases. And parties combining and confederating with him to despoil the estate in any way may be held as participants in the devastavit and breach of trust. We may even concede the doctrine declared by the Court of Appeals of Virginia, that a debtor who pays to an executor in depreciated currency a debt payable in gold or its equivalent, knowing at the time that the currency is not needed for the payment of debts or legacies, or other uses of the estate, and that the safety of the debt does not require its collection, may be also charged as a participant in the devastavit. *Patteson* v. *Bondurant*, 30 Gratt. 94. The present case does not come under the doctrine. It falls within the class where, for debts payable in lawful money, the depreciated currency of the country where they were contracted and the executor resides can be used at its face value in payment of legacies, and, therefore, may be accepted by him without a breach of trust. The notes received had in October, 1862, to a great extent, superseded the use of coin, and become the principal currency of the Confederate States. All business transactions there were had with reference to them. They were a standard of value, according to which contracts were made and discharged. Having, therefore, an exchangeable value, they were sought for by residents within

the Confederacy. The resident executor there, however, hesitated to accept them in payment of the last bond of Spears, which, being made in October, 1860, must be considered as payable in lawful money, and he consulted the wishes of legatees in Virginia, among whom the greater part of the money was to be distributed. They desired him to take the notes, and received them in discharge of their distributive shares. So far as those legatees are concerned, their approval of his action was shown by their expressed wishes, and their acceptance of the notes. They, at least, are estopped from questioning the propriety of his conduct.

Glasgow's check called for dollars, and when it was received on deposit and placed to the credit of the resident executor, it was a matter between him and the bank whether he would receive Confederate notes for the amount. Had he been unwilling to receive them, and the bank had refused to give any other money, he should have notified the drawer, and, by returning the check, asked to be restored to his original position; but so far from taking that course he received them, and therewith paid the legatees in Virginia. Glasgow was informed when he gave the check that they wanted their money and were willing to take what he had offered. So, if we treat the check as intended to draw such notes, there is no ground on which the validity of the payment can be assailed, so far as the estate of Spears is concerned.

It is not necessary for us to determine whether or not the act of Virginia, allowing a resident fiduciary, authorized to execute a power or do an act jointly with one or more fiduciaries residing out of the Confederacy, to exercise such power or do such act without the concurrence of the non-resident fiduciary, was a valid exercise of legislative power, so as to justify the resident executor in executing the deed. It is a sufficient defence to the present suit that the entire purchase money for the land was paid, for it is upon the alleged non-payment of the last two instalments that the suit rests. He had full authority to collect them, and it was not necessary that his co-executor should join in the receipts. *Edmonds* v. *Crenshaw*, 14 Pet. 166. If the deed did not pass the title, a

court of equity would, after such payment, compel those holding the legal title to execute a sufficient deed.

As to the rights of the legatees, including the co-executor, residing in Indiana, only a word need be said. If they have just ground to complain of the resident executor, and their rights can at this date be judicially enforced, they must proceed by suit against his representatives, or, excepting the co-executor, against his sureties. *Morrow* v. *Peyton*, 8 Leigh, 54; *Lidderdale* v. *Robinson*, 2 Brock, 160. When such suit is brought it will be time enough to consider how far the settlement of his accounts can be impeached, and how far any remedy is affected by alleged laches. At present these questions require no answer.

The decree of the court below must be

*Reversed and the cause remanded, with directions to dismiss the suit.*