## OPIE *v.* CASTLEMAN.

*(District Court, D. West Virginia. 1887.)*

1. PAYMENT—CONFEDERATE MONEY.
    A. and B. entered into a contract for the sale of land in 1856. The deferred payments under the contract came due during the years of the civil war, and were paid by the vendee. B., to the personal representative of A. with depreciated Confederate money. *Held,* that as against the heirs of A. not ratifying it, such payment did not extinguish the indebtedness: the original contract contemplating payment in lawful money of the United States.

2. EXECUTORS AND ADMINISTRATORS—PAYMENT OF DEBTS DUE THE ESTATE—CONFEDERATE MONEY.
    The act of a fiduciary in accepting Confederate money in payment of debts due the estate, and investing the proceeds in bonds of the Confederate States, issued for the avowed purpose of waging war against the United States, is wholly illegal and void.

3. SAME.
    Where the necessity of the estate requires it, a fiduciary may accept depreciated currency in payment of indebtedness to the estate; but not where it appears that the estate is not embarrassed by debt, and there is little or no need of the money for any legitimate purpose.

4. LIMITATION OF ACTIONS—SUSPENSION—WAR.
    In an action to enforce a deed of trust made in 1856, a recovery on one of the notes secured was barred by the statute of limitations. *Held,* that the period during the war should be deducted from the operation of the statute.[1]

5. SAME—ACTION TO ENFORCE TRUST DEED.
    A deed of trust can be enforced within 20 years after the maturity of the debts secured by it.

In Equity.
*Robert White,* for complainant.
*Marshall McCormick* and *R. T. Burton,* for defendant.

JACKSON, J. In 1856, Hiram L. Opie, the ancestor of the plaintiff, sold to Henry W. Castleman, now deceased, a tract of land in Jefferson county, then in the state of Virginia, now West Virginia, for the sum of $41,733.66, $10,000 cash in hand, and the balance in deferred installments; evidenced by notes bearing date January 1, 1856,—the first for $5,000, due January 1, 1857; the second for $5,000, payable January 1, 1858; and six other notes for $3,622.27¼, payable, respectively, January 1, 1859, 1860, 1861, 1862, 1863, 1864,—all bearing interest from date. Shortly after the sale of his land, he moved to Augusta county, Virginia, then and ever since a county in the state of Virginia, where he resided until his death in 1862. At the time of the sale a deed conveying the property was made by the vendor to the purchaser,

---

[1] The existence of war suspends the statute of limitations as between citizens of the adverse belligerent powers, but not as between citizens of the same power. Cross v. Sabin, 13 Fed. Rep. 308. Under the act of congress of 1863, requiring claims against the United States, cognizable by the court of claims, to be sued upon within six years after the cause of action first accrues, and excluding all exceptions to the running of the statute except those enumerated, held, that the disability of one to sue, arising from his connection with the rebellion, would not suspend the operation of the statute. Kendall v. U. S., 2 Sup. Ct. Rep. 277.

and a deed of trust was executed by the purchaser upon the land conveyed to secure the payment of the unpaid purchase money. When the grantor died there remained unpaid of the purchase money four bonds, each for the sum of $3,622.27, due and payable the first day of January, 1861, 1862, 1863, and 1864, respectively; it being conceded that the interest was paid up to January, 1861.

In 1861, certain states, afterwards known as the Confederate States, seceded from the Union, whereby war ensued between the United States and the so-called Confederate States, and during the war the county of Jefferson was for the most of the time in the military possession of the United States, while the county of Augusta during the same period was mostly in the military possession of the so-called Confederate States. In 1863 the state of West Virginia was created, whereby Jefferson county became a part of that state. In November, 1862, the widow of the deceased and Thomas L. Opie qualified as personal representatives of the estate of the decedent. Late in the year 1862, Castleman, knowing there was due on the purchase money of the bond which had matured January 1, 1861, and on the bond to fall due in January, 1862, something over $8,000, with unpaid interest, got together notes of the Confederate States and Virginia bank notes sufficient to pay off the notes payable January, 1861 and 1862, and crossed the military lines into the Confederate States, and found Mrs. Opie, one of the personal representatives, and paid off and discharged the notes of 1861 and 1862 with Confederate money, which at the time was greatly depreciated. Subsequently Castleman paid and discharged the notes that fell due in January, 1863 and 1864, in the same kind of depreciated currency. At the time the payments were made, Mary and John, heirs of the decedent, were under age, and the plaintiff in this action was absent from home, and has not ratified the action of the personal representative of the estate. In 1865 a release was executed by the trustee in the deed of trust, upon the request of Mrs. Opie, administratrix of the estate. The estate of the decedent was not in debt, and the greater part of the money which came into the hands of the personal representatives was invested in bonds of the Confederate States.

These are substantially the facts of the case, and the question that presents itself for the consideration of the court is, were the payments made on a contract entered into before the war, and which at the time was to be discharged by the lawful money of the United States, satisfied and extinguished by the payments made to the fiduciaries in depreciated currency? It is to be borne in mind that the relation of a fiduciary to the estate he represents is very different from that of the decedent, if living. The latter could exercise unlimited discretion to do as he saw proper in accepting as payment of a debt due him any currency passing for money, however depreciated; while the former, acting in a fiduciary capacity, would be required to exercise the soundest discretion. A personal representative must act in good faith with the estate he has in charge. It is his duty to look after the estate, preserve it from waste, and protect it from unnecessary expenditure.

In the case before us there is no charge of neglect of property, or the usual charge of waste connected with its administration. The heirs, in this instance, who are asserting their rights in this action, did not ask for a distribution of its assets; two of them being minors, and the other absent from home most of the time. It does not appear that they consented or acquiesced in the action of the personal representatives. Moreover, the debtor was not pressed or required to pay the money. On the contrary, he seemed to have put himself to unusual trouble to secure the funds with which to pay the debts due the estate in a depreciated currency, the greater portion of which he had to borrow, and which only had a purchasing power of one-third its face value. This attempt to pay and discharge the debt was made outside of the military lines of the United States, to satisfy a debt fully secured upon lands inside the federal lines, in a currency not only unauthorized by the laws of the land in which the contract was made, and where the debt was properly payable, but the proceeds were invested in the bonds of the Confederate States, issued for the avowed purpose of waging war against the United States. For this reason we are inclined to the opinion that this action of the fiduciary is wholly illegal and void. We might well rely upon this position as conclusive of the case. It is, however, contended that the fiduciary should not have accepted the payment of the debt in Confederate money. We do not deny that, where the necessity of the estate requires it, the fiduciary may, in the exercise of a sound discretion, do that which will promote the best interests of the estate. This rule is, however, general in its character, and its application must be controlled by the circumstances surrounding each case. In this case the estate was not embarrassed by debt, and there was little or no need of money for any legitimate purpose.

But we do not rest this cause alone upon that position. As before remarked, this attempt to pay off and discharge this debt was made to the agent or trustee of the estate, and not to the principal in life. We have already said that the rule governing the action of a fiduciary to an estate is entirely different from the one that would apply to its owner, if living. In the case of the fiduciary, he has but little or no discretion, while the other is not bound by any limitation of that character. The principal in a debt may accept a payment of a debt due him in depreciated currency, but his agent could not do so; and so it was held in the case of *Ward* v. *Smith*, 7 Wall. 447, that an agent cannot accept payment of a debt due his principal in depreciated currency, although it was the principal currency in which the ordinary business transactions of the country were conducted. The case cited would seem to be conclusive as to the validity of the payment made by the debtor to the representative in the case under consideration. Following closely upon this case was the case of *Horn* v. *Lockhart*, 17 Wall. 570, in which the supreme court of the United States held that where an executor had sold the property of his testator, and received payment in Confederate money, and invested it in Confederate bonds, and settled his accounts before the probate court, not only was the action of the executor invalid, but the action of the pro-

bate court was a nullity, and afforded him no protection. It is true that this ruling was based upon the ground that the action of the executor in making investments in Confederate bonds was in aid of the Rebellion. And so it was in this case. The debt was collected in Confederate money and invested in Confederate bonds, and it falls within the rule of the law as laid down in the case cited. There was, however, more excuse for the action of the executor in the case cited than for the fiduciary in the one under consideration. The executor in the case cited was in the heart of the Confederacy, and the country was entirely under the control of the Confederate authorities, and it is but fair to presume that there was but little or no choice left him as to his course of action. Not so in this case. The military lines often shifted, and the military authorities of the United States were not unfrequently in possession of Augusta county, the place of residence of the administratrix of the estate. Under such circumstances, ample opportunity offered to enable both parties to settle the debts due the estate in money called for by the contract.

It is further insisted that Castleman's effort to pay off and discharge a debt under the circumstances was an illegal act upon his part, and consequently void. It will be observed that Castleman's action for the most part was voluntary. There is no evidence in the record which discloses the fact that he was required to pay the notes past and falling due. But the evidence tends to show a feverish desire on his part to get rid of this indebtedness with little expense as speedily as possible, and with the least inconvenience to himself. It is quite apparent that he wanted to pay the debt, which was contracted at the time with reference to the standard value of money in the United States, in a currency far below that value, and in fact possessing only a purchasing power of one-third of its apparent value. This attempt thus to satisfy a debt so well secured, and when there existed no necessity for its collection, and when he was not required to pay with any other money than that called for in the contract, savors not only of a fraud, but is an injustice to the heirs of this estate, and should be disregarded. If the personal representatives were not justified in accepting in payment any other money than that called for by the contract, then, clearly, Castleman had no right to pay them in the money he did. In the language of Judge DAVIS, speaking for the court in the case of *Fretz* v. *Stover*, 22 Wall. 198: "It was a void act on his part to attempt to discharge his debt in this way, as well as a fraud in the personal representative to suffer him to do so." In the further support of this position we rely upon the law as stated in the case of *McBurney* v. *Carson*, 99 U. S. 567. There are other adjudications to this effect in the state tribunals, but we content ourselves with those we have cited to sustain this view of the case.

It is insisted, however, that the supreme court in the case of *Glasgow* v. *Lipse*, 117 U. S. 327, 6 Sup. Ct. Rep. 757, has changed its position, and that, under the law as stated in that case, the payment by Castleman to the personal representatives was legal, and that, as a consequence, the plaintiff is not entitled to recover. We do not concur with this view. The cases are very different, and necessarily the rule of law applicable

to this case cannot be the same. In that case the executors were authorized by the will to sell the land, and convey it to the purchaser. There the contract was with the executor, and not, as in the case under consideration, with the decedent, who, if living, could accept payment in any authorized money without regard to its value. As we have before said, the case is far different with an executor or an administrator. In *Glasgow* v. *Lipse* the executor, acting under the power conferred by the testator, sold the land, and conveyed it by deed to one Speers. After the purchase, Speers died, and Glasgow became, under his will, the executor. In that case a demand was made by the executor of Lipse upon Glasgow for the money due the estate, and Glasgow was informed that the heirs wanted their money, and that they were willing to accept it in Confederate notes, which had then become the principal currency of the country. In the case under consideration, there was no demand made on the debtor for money for distribution among the heirs, nor does it appear that it was needed for any of the uses of the estate which would require the personal representative to call for the payment. We must therefore conclude that no legal excuse existed for the action of the fiduciaries in accepting, as they did, the payment of the debt due from Castleman in Confederate money. Certainly, the debtor had taken no steps to coerce them to receive the money offered in discharge of his debts, but they determined to accept it and reinvest it. Under the circumstances, the acceptance of the money in depreciated currency, and its reinvestment, was not only illegal, but, as we said, directly in aid of the Rebellion, and in contravention of public policy.

It is contended that the plaintiff should not recover on account of his laches in prosecuting this case. We do not concur in this defense. The record discloses the fact that the personal representatives have never made a settlement of the estate, and that they moved out of the state of Virginia, and carried all papers with them relating to their administration; that the plaintiff came out of the war financially ruined, and was unable to institute an action for want of means; that the deed of release to Castleman was not placed on record until near the close of the year 1871. The action, however, was commenced in the spring of 1881, and if the notes had been sued upon at law the statute of limitations would not have barred a recovery upon them. Courts of equity usually follow the rule of law in the application of this statute. But this action is to enforce the deed of trust given to secure the payments of the purchase money. The release was placed on the record only 10 years before the suit was commenced. It is sufficient to meet this position that a deed of trust can be enforced within 20 years after the maturity of the debts secured by it. All of the notes secured are within the time, save one, and the period deducted from the operation of the statute during the war saves it.

But one more position of the defense remains that we think necessary to notice; and that is, under the circumstances, were not the fiduciaries justified in their action? Numerous authorities have been cited from the highest courts of Virginia that when the necessities of the estate require money to pay debts it owes, and where legatees and distributees

consent to receive it, and when the security for the debt is doubtful, it is wise to accept the payment in depreciated currency. Of course, every case is governed, more or less, by its surroundings; but in this case none of the reasons assigned exist, as we have shown. We are of opinion that not only is the plaintiff, as a matter of strict legal right, entitled to the relief sought, but that it is only simple justice. The heirs of Castleman enjoy a landed estate of great value, which was purchased to be paid for in lawful money of the United States, and the heirs of Opie, who are suing in this case, have never received the consideration promised under the contract entered into in 1856. We take no notice of the fact that the money received by the executors as payment of the debts due had some value, for the reason that we hold the payment, so far as the parties to this action are concerned, was illegal and void, and any relief the heirs of Castleman may have, if, indeed, they have any, is against the executor.

A decree will be prepared in conformity with the views of the court as expressed in this opinion, referring the cause to a commissioner to ascertain the interests of the plaintiff and the two heirs, John Opie and Mrs. Mead, in the debt secured by the deed of trust upon the land sold by their ancestor.