## WASHINGTON v. OPIE.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR
THE DISTRICT OF WEST VIRGINIA.

No. 282. Argued April 8, 11, 1892. — Decided May 2, 1892.

Payments of bonds secured by a mortgage of real estate in Virginia, made in that State during the civil war to the personal representatives of the mortgagee who had deceased, partly in Confederate notes and partly in Virginia bank notes issued prior to the war, are *held* to have been made and received in good faith, and the transactions to have been known to the children of the deceased, and to have been accepted and acquiesced in by them for so long a time as to preclude any interference in their behalf by a court of equity.

THE case is stated in the opinion.

*Mr. Marshall McCormick* and *Mr. R. T. Barton* for appellants.

*Mr. Robert White* for R. L. Opie, John N. Opie and Mary Meade, appellees.

MR. JUSTICE HARLAN delivered the opinion of the court.

Heirome L. Opie, by deed dated January 1, 1856, conveyed to Henry W. Castleman two tracts of land in Jefferson County, then in Virginia, now in West Virginia — one tract containing 596 acres and the other 419 acres — for the price of $41,733.66½, of which $10,000 was paid at the time in cash, and for the remainder the grantee gave his bonds, or single bills, bearing interest from date and payable annually; two for $5000 each, payable, respectively, on the first days of January, 1857 and 1858, and six for $3622.27¾ each, payable respectively on the first days of January, 1859, 1860, 1861, 1862, 1863, and 1864. These bonds were secured by a deed of trust to Robert Y. Conrad, which was duly acknowledged by Castleman and recorded January 2, 1856.

When this transaction occurred both Opie and Castleman

resided in Jefferson County. But shortly afterwards Opie removed with his family to Staunton, in Augusta County, Virginia, where he died in June, 1862, leaving him surviving his wife, Nannie S. Opie, and four children, the present appellee, H. L. Opie; Thomas Opie, born in February, 1840; Mary Opie, born January 25, 1842; and John N. Opie, born March 14, 1844. The record does not show the age of the appellee, but he was old enough to have served in the Confederate army during the entire period of the late civil war. The widow and Thomas Opie qualified as the personal representatives of the decedent.

The bonds maturing in January, 1857, 1858, 1859 and 1860, principal and interest, as well as the interest due on all the others up to January 1, 1861, were paid to Heirome L. Opie in his lifetime; presumably, in lawful money. In the fall of 1862 Castleman paid to his personal representatives the entire amount of the bonds maturing in 1861 and 1862. This payment was made at Staunton in what was known as Confederate treasury notes, which, at the time, constituted the principal, if not the only, circulating medium in that locality, and passed current in the county where Castleman resided. The bonds so paid were surrendered to Castleman.

On the 1st of February, 1863, and 4th of January, 1864, respectively, Castleman paid, through others, to the personal representatives of Opie the full amount of the bonds falling due in those years. The payments were made in what was commonly called Virginia money, that is, Virginia bank notes issued prior to the civil war. Each bond so paid was delivered to Castleman, or to his agent, at the time of payment.

When the last bond, the one maturing in 1864, was paid, the personal representatives of Opie executed and delivered to Castleman's agent, through whom it was paid, a written order addressed to the trustee in the deed of 1856, directing the release of the lien created by that instrument. This order having been presented to the trustee, he made his deed of September 7, 1865, (which was duly acknowledged the same day,) referring to the deed of 1856, and the bonds secured by it, and declaring: "And whereas said Castleman hath pro-

duced to said Conrad the last one of said bonds, paid and cancelled, and also a paper signed by Thomas Opie, administrator, and N. S. Opie, administratrix, of said Heirome L. Opie, (who has deceased,) acknowledging the payment in full of all said purchase-money and requesting a release of said deed of trust : Now, in consideration of the premises, the said Robert Y. Conrad doth release unto the said Henry W. Castleman all his, said Conrad's, claim upon the said tracts of land by virtue of said deed of trust." This deed of release was recorded February 10, 1871.

The plaintiff, in his deposition, given in his own behalf, referring to the payment of the bonds, said : "I first learned of their payment shortly after they were made. I received my first information from the personal representatives of my father's estate. . . . I know that three of the bonds were paid in Confederate money because Castleman told me so, as did also the personal representatives of my father's estate. The payment made in 1864 was made by Mr. Sinclair [for Castleman] in Virginia bank notes. I know this because I got a portion of them after the war. . . . The Confederate money paid by Castleman was put into Confederate bonds, which I saw afterwards. The Virginia money was held until after the war and divided between the heirs, but it was worthless, the Virginia banks having all their money in Confederate bonds, and were so compelled by law. Quite a number of bank notes were returned to Castleman by my mother after the war. I saw them mailed to Castleman. The whole was an entire loss to the distributees of my father's estate."

The present suit was brought by the appellee, H. L. Opie, December 4, 1880, the original defendants being Castleman, Nannie S. Opie, Thomas Opie, John N. Opie and Mary Meade, formerly Mary Opie. Castleman answered, but the bill was taken for confessed as to the other defendants. The executors of Conrad were made parties defendant, and an order recites that they appeared and answered, but the record does not contain their answers.

Subsequently, September 1, 1885, the plaintiff filed a second bill of complaint, stating more fully his cause of action. The

material allegations of the amended bill are: That the obtaining of said bills or bonds from the personal representatives of Heirome L. Opie was in execution of a fraudulent scheme upon the part of Castleman to pay them off with "worthless or next to worthless Confederate money;" that by appealing to the fears of the personal representatives, and by persuasion and with the assistance of one or more persons employed to aid him in executing his fraudulent purposes, he, Castleman, induced them to deliver to him the said bills, and "to receive therefor nothing but said worthless Confederate money to a very large amount — that is, to an amount large enough to cover the total amount of said single bills and interest then unpaid — and passed to said Nannie S. and Thomas such Confederate money at the nominal amount appearing upon the face of the notes;" that nothing was paid by him after the death of his grantor, "except such worthless Confederate money;" that he fraudulently procured the writing signed by the personal representatives, acknowledging the payment of said bills, and requesting the release of the deed of trust; that at the time of said transaction John N. Opie was an infant; that said deferred payments on the land purchased by Castleman became, by reason of his acts, a total loss to the estate of Heirome L. Opie; that the personal representatives have never made a settlement of their accounts, nor accounted to the distributees of the estate for any part of said unpaid purchase-money or bonds; that the estate was entirely solvent; and that the plaintiff many years ago removed to Kentucky, and did not know until recently of the release of the deed of trust, and could not have had constructive notice of it until February 10, 1871, and in fact did not until recently before this suit know of it, or of the condition of affairs connected with the bonds given by Castleman. The bill also alleges: "Your orator knows that even if he could do so it would be wrong for him to make said Nannie S. and Thomas Opie responsible for said unpaid purchase-money bonds under the circumstances of the case, for he feels perfectly satisfied that they were deceived and defrauded by said Castleman in the premises. But he does charge that they had no right to

receive said Confederate money in payment of said bonds or otherwise for them or to give up said bonds to said Castleman, and said Castleman has no right to have them or treat them as paid. Said Castleman has since his said purchase all the while been possessed of and enjoyed the said valuable property for which he has not honestly paid, and so much of said purchase-money as was not paid dollar for dollar by said Castleman has been thus far a total loss to the estate of said Heirome L. Opie and his heirs at law."

The principal relief asked was that Castleman be required to pay "in good, lawful money so much of said purchase-money, single bills and interest thereon, as has not been paid in good, lawful money," and that in default thereof a trustee be appointed by the court, to sell the real estate to pay off the price "in good and lawful money" to the legal representatives or distributees of Heirome L. Opie, according to their respective rights, including the widow.

Castleman demurred to the bill as insufficient in law, and, also, filed an answer denying all the material allegations of the bill. Answers were also filed by Mrs. Meade and John N. Opie, in which they pray that the release of the deed of trust be set aside. But they do not file cross-bills, or make any direct issue, in that mode, with Castleman.

It should be stated in this connection that by deed executed by Castleman March the 22d, 1878, and which was duly recorded, a part of the lands purchased by him from Heirome L. Opie in 1856 was conveyed in trust to secure a debt due by bond to the executor of E. I. Smith, which, on the 1st of August, 1887, amounted, principal and interest, to $5706.67. This debt originated in 1863, the Virginia bank notes paid in that year to Opie's personal representatives having been borrowed by Castleman from Smith.

By an interlocutory decree, passed September 30, 1887, 32 Fed. Rep. 511, it was adjudged that the payments made by Castleman of the above bonds, due in 1861, 1862, 1863 and 1864, were illegal and void, and that the release of the deed of trust by Conrad was of no effect; but, that, inasmuch as the widow and Thomas Opie acquiesced in and consented to

such payment, the bonds were discharged to the extent of their interests; and, that with respect to the plaintiff, Mary Meade and John N. Opie, they were, each, entitled to receive from Castleman (regarding the original interest of the widow as one-third) one-fourth of two-thirds of the original amount of said bonds, principal and interest; and that the deed of trust remained as a valid security for their claims. The release, by Conrad, of the deed of trust was set aside and declared to be of no effect as to the interests of the plaintiff, John N. Opie and Mary Meade. By the final decree it was found and adjudged that the amount due April 16, 1888, to the plaintiff, Mary Meade and John N. Opie, each, was $6369.15. The lands in question were ordered to be sold in satisfaction of those claims, which were given by the decree priority over all other debts against Castleman's estate including even that due to Smith's estate.

The allegation, in the bill, that the personal representatives of Opie were induced by fear or persuasion to accept Confederate money in payment of Castleman's bonds falling due in 1861 and 1862, and Virginia bank notes in payment of those falling due in 1863 and 1864, is unsupported by the evidence. Nor is there any proof of fraud committed by Castleman, unless it was a fraud upon his part to pay his bonds in the only kind of money that was current or in general use in the locality where he and they, at the time of payment resided. Castleman testified that the personal representatives of Opie accepted Confederate notes in payment of the bonds of 1861 and 1862 without the slightest hesitation or objection, and on the occasion of that payment expressed their willingness to accept payment, in like money, of the bonds of 1863 and 1864; but that shortly before the maturity of the bond of 1863 he was notified by them to make payment in Virginia bank notes. And this demand was complied with by him. The bond of 1863 was paid in money of that kind, and was surrendered by the personal representatives. Sinclair, through whom the bond of 1864 was paid, testifies that no objection was made by either of the personal representatives to payment in Virginia bank notes, and that the written order for the release of

the trust deed was prepared and delivered to him for Castleman by Thomas Opie himself. If the statements of Castleman and Sinclair, upon these points, were not strictly in accordance with the truth, the contrary could have been proven by the personal representatives. But their depositions were not taken. The plaintiff gave notice to take their depositions in Baltimore, and Castleman attended, with counsel, at the time and place designated in the notice. But neither the plaintiff nor his counsel appeared, and the depositions were never taken. No reason is suggested why they were not taken. It must, therefore, be taken as conclusively established that the personal representatives of Opie voluntarily accepted payment of the bonds of 1861 and 1862 in Confederate money, and that they demanded and received Virginia bank notes in discharge of the bonds of 1863 and 1864.

But this is not all. Castleman testified that the plaintiff was present when the bonds of 1861 and 1862 were paid in Confederate notes, and counted out the money for his mother. The plaintiff testifies that he was not present at any of the payments. But the plaintiff admits that he learned, from the representatives of his father, of the payments of 1862 and 1863, shortly after they were made, and that after the war the Virginia bank notes were divided among the heirs, he receiving his portion of them. It is absolutely certain, from the evidence, that the plaintiff knew at least fifteen years prior to the commencement of this action, that Castleman's bonds, falling due in 1861, 1862, 1863, and 1864, were paid off, during the war, partly in Confederate money and partly in Virginia bank notes. And it cannot be doubted that these facts were known, during the whole of the same period, to Mary Opie, who reached her majority in January, 1863, and to John N. Opie, who reached his majority in March, 1865. If this were not so, they would have testified as witnesses, and stated the contrary.

Under such circumstances, is the plaintiff entitled to the aid of a court of equity as against the estate of Castleman? Avowing his purpose not to hold the personal representatives of his father's estate responsible for having accepted Confederate

money and Virginia bank notes in discharge of Castleman's bonds, and for having directed the release of the trust deed given to secure those bonds, can he be heard to say that these settlements, some of the fruits of which he and his codistributees enjoyed, and of which he had full knowledge for at least fifteen years prior to the commencement of this action, ought not to have been made and should be now disregarded? These questions can be answered only in one way in a court of equity.

The present case in some of its features is not unlike that of *Glasgow* v. *Lipse*, 117 U. S. 327, 334. The facts in that case were these: Lipse's executors having authority to dispose of the real property of the testator, who died in Virginia, sold certain lands in that State to Spears in 1860. One of the payments fell due in October, 1861, another in October, 1862. The bonds were paid in a check on a Virginia bank, which was deposited in that bank by the resident executor who received it. Against that deposit the executor drew his checks, which were paid in Confederate notes. The principal question in the case was whether the debtor was discharged from liability to pay his bonds in lawful money of the United States. This court, after referring to the doctrine declared by the Court of Appeals of Virginia, (*Patteson* v. *Bondurant*, 30 Gratt. 94,) that a debtor who pays to an executor in depreciated currency a debt payable in gold or its equivalent, knowing at the time that the currency is not needed for the payment of debts or legacies, or other uses of the estate, and that the safety of the debt does not require its collection, may also be charged as a participant in the *devastavit*, said: "The present case does not come under the doctrine. It falls within the class where, for debts payable in lawful money, the depreciated currency of the country where they were contracted and the executor resides can be used at its face value in payment of legacies, and, therefore, may be accepted by him without a breach of trust. The notes received had in October, 1862, to a great extent, superseded the use of coin, and became the principal currency of the Confederate States. All business transactions there were had with reference to them. They were a standard of

value, according to which contracts were made and discharged. Having, therefore, an exchangeable value, they were sought for by residents within the Confederacy." In reference to the issue as to whether the legatees were estopped to question the action of the executor, the court said : "The resident executor there, however, hesitated to accept them [Confederate notes] in payment of the last bond of Spears, which, being made in October, 1860, must be considered as payable in lawful money, and he consulted the wishes of legatees in Virginia, among whom the greater part of the money was to be distributed. They desired him to take the notes, and received them in discharge of their distributive shares. So far as those legatees are concerned their approval of his action was shown by their expressed wishes, and their acceptance of the notes. They, at least, are estopped from questioning the propriety of his conduct."

The plaintiff alleges, in his bill, that his father's estate was perfectly solvent; in nowise involved in debt. The only persons, therefore, interested in the collection of Castleman's bonds were the widow and the children of Heirome L. Opie. The court below correctly held that the widow and Thomas Opie were concluded, as to their interests, by the voluntary acceptance of Confederate money and Virginia bank paper in discharge of Castleman's obligations. Upon every principle of justice, the plaintiff is equally concluded by his knowledge shortly after, if not at the time of, the surrender to Castleman of the bonds of 1861 and 1862, that they were paid in Confederate notes; by his voluntary acceptance of his part of the Virginia bank notes paid by Castleman in discharge of the bonds of 1863 and 1864; and by his failure, for more than fifteen years, to assail, in some direct legal mode, the validity and good faith of the settlements with Castleman. The reason given by the plaintiff why he was so long silent is, that he removed from Virginia to Kentucky in 1873, and from the close of the civil war up to the fall of 1880 was not, although himself a lawyer, financially able to bring this suit or to carry it on. We cannot regard this as a sufficient excuse for his inaction, even if it had been competent for him, after his accept-

ance of a part of the Virginia bank notes paid by Castleman, to have questioned the action of the personal representatives.

With respect to the interests of the two distributees, who were not of full age when Castleman paid the bonds of 1861 and 1862, it is only necessary to say that Mrs. Meade had reached her majority when Castleman made his last payment, and both were of full age when, after the war, the Virginia bank notes received from Castleman were divided among the distributees. We cannot suppose, from the evidence, that they were ignorant of the settlements made by the personal representatives with Castleman. So far as the record discloses, no fraud was practised upon them; nothing was concealed from them. When the Confederacy fell, Confederate notes and Virginia bank notes, based upon Confederate bonds, became, of course, of no value. Then it was that Mrs. Opie sent back, by mail, to Castleman, some of the bank notes paid by him; those, perhaps, which she had retained for herself. At that time, if not before, all the facts were necessarily known to Mrs. Meade and John N. Opie, as they were known to the plaintiff. If the plaintiff, Mrs. Meade and John N. Opie, have determined not to hold their mother and brother liable for having voluntarily received payment from Castleman in the only currency used in the locality where all the parties resided; Castleman's estate, he not being chargeable with fraud, ought to be equally exempt from liability.

According to the decided preponderance of evidence, the plaintiff, Mrs. Meade and John N. Opie, during the entire period from the close of the war until the institution of this suit, acted as if they did not intend, by legal proceedings, to question the validity of the settlements made with Castleman. And they so acted with full knowledge, or with ample opportunity to acquire knowledge, of all the material facts affecting their rights. By their long silence, and their unreasonable delay in commencing proceedings for relief, they have forfeited whatever right they had to invoke the aid of a court of equity. What they did and what they failed to do is sufficient — independently of any statute of limitations, and apart from any question as to the legal right of the personal representa-

tives to accept, or of Castleman to pay, the bonds of the latter in Confederate money or Virginia bank notes — to establish acquiescence upon their part, in what was done by the personal representatives, and to preclude any interference in their behalf by a court of equity. 1 Story's Eq. Jur. § 529; 2 Id. §§ 1520, 1540; 2 Pomeroy's Eq. Jur. §§ 817, 818, 819, and authorities cited under each section; Kerr on Fraud and Mistake, 298 to 305.

*The decree is reversed, and the cause is remanded with directions to dismiss the bill.*