Robert I. POWELL, Appellant,

v.

Eugene M. ZUCKERT et al., Appellees.

No. 19793.

United States Court of Appeals
District of Columbia Circuit.

Argued March 25, 1966.

Decided July 28, 1966.

Mr. David I. Shapiro, Washington, D. C., for appellant. Mr. Sidney Dickstein, Washington, D. C., also entered an appearance for appellant.

Mr. Henry J. Monahan, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., and Frank Q. Nebeker and Gil Zimmerman, Asst. U. S. Attys., were on the brief, for appellees.

Before DANAHER, WRIGHT, and LEVENTHAL, Circuit Judges.

**J. SKELLY WRIGHT, Circuit Judge:**

Appellant was employed as a supervisory electronic engineer by the Department of the Air Force at Fuchu Air Station, Japan. On being advised by the Air Force that he would be removed from his position for various alleged violations of regulations, appellant, a veterans preference eligible, 5 U.S.C. §§ 851, 863, elected to contest his removal under the Air Force grievance procedures. The Ad Hoc Grievance Committee conducted a hearing, sustained the removal notice, and appellant appealed to the Twelfth Civil Service Region, San Francisco, California, where the removal was again sustained after a hearing before an appeals examiner at which appellant was present but unrepresented by counsel. The Board of Appeals and Re-

view affirmed the decision of the regional office, and the Civil Service Commission denied appellant's petition for discretionary review on April 25, 1963. Appellant filed this action in the District Court seeking judicial review of his discharge on August 26, 1964. The District Court granted summary judgment on the ground of laches.

## I

The defense of laches stems from the principle that "equity aids the vigilant, not those who slumber on their rights," and is designed to promote diligence and prevent enforcement of stale claims. 2 POMEROY, EQUITY JURISPRUDENCE § 418 (5th ed. 1941). To establish the defense the evidence must show both that the delay was unreasonable and and that it prejudiced the defendant. Duncan v. Summerfield, 102 U.S.App. D.C. 185, 251 F.2d 896 (1957). Although appellant's delay of sixteen months in filing suit since exhaustion of his administrative remedies is not generally considered enough time to warrant a finding of laches,[1] the District Court concluded that the time period was inadequately explained and caused prejudice to the Government by requiring it to hire and pay another employee.

Appellant's explanation of his delay in filing suit is inability to secure legal assistance and advice because of his uncontroverted poverty. The District Court considered this "not a judicially cognizable excuse against a claim of laches," citing cases from the Supreme Court and from other federal courts which state generally that poverty is no excuse for postponing assertion of rights. "In an era when the greatest effort in history is being made to neutralize financial disparity in litigation," the court continued, "there is little reason why a suitor should have to meet frustration because he permitted his limited means to influence too late a start." In fact, the court concluded: "To afford an impecunious litigant the privilege of delayed action denied his wealthier counterpart would be an invidious mistake," and "A principle that would recognize as an excuse for a stale lawsuit the amount of time every discharged public employee expended in preparation to meet litigation needs through inadequate personal resources would wreak havoc upon the operations of government."

The relationship of poverty to laches is a muddy little subject. The germinal case is Hayward v. National Bank, 96 U.S. (6 Otto) 611, 618, 24 L.Ed. 855 (1877), where Justice Harlan observed that plaintiff's "poverty or pecuniary embarrassment was not a sufficient excuse for postponing the assertion of his rights." Actually, Hayward offered no proof whatever of poverty. He had left some stock with the National Bank as security for some loans, and the stock was sold, after notice to Hayward, because he failed to pay his notes when due. For four years he remained silent. Then, when the stock's market price made an "extraordinary advance," he brought suit to nullify the sale. The only evidence on Hayward's financial status revealed in the opinion is that the stock was sold for over $35,000, and that Hayward had been on familiar terms

---

1. Attorney General Brownell, in a memorandum dated August 1, 1956, concerning claims for reinstatement by former employees dismissed under Executive Order 10450, took the position that department and agency heads ought not to press claims of laches "unless there was a lapse of more than 18 months during which the former employee can be shown to have acquiesced in all respects in the action taken." Laches has been applied for delays of less than 18 months by this court ·and the Supreme Court in very few cases. Norris v. United States, 257 U.S. 77, 42 S.Ct. 9, 66 L.Ed. 136 (1921) (eleven months delay during which no effort was made to obtain reinstatement or compensation) ; Caswell v. Morgenthau, 69 App.D.C. 15, 98 F.2d 296 (1938) (eighteen months unexcused delay). The sixteen-month, inadequately explained delay in filing a lawsuit in Grasse v. Snyder, 89 U.S.App.D.C. 352, 192 F.2d 35 (1951), was aggravated by a prior two-year delay by plaintiff in appealing his discharge to the Civil Service Commission.

with his bank's officers during the four-year period. There was no claim that Hayward had tried during the four-year period to institute litigation.

 The *Hayward* dictum has been cited by a number of courts. But, as in *Hayward,* the broad pronouncements regarding poverty have invariably been unnecessary. These cases involved periods of delay far longer than eighteen months[2] and plaintiffs who either failed to demonstrate that their delay in bringing suit was related to poverty,[3] or who failed to demonstrate diligence.[4] Obviously a plaintiff cannot explain his lack of diligence simply by claiming he was poor. But it is equally clear that poverty may cause special difficulties which a plaintiff must labor to overcome in order to bring suit. Courts have recognized that special circumstances may intervene and make the institution of litigation more difficult, and have judged the question of laches in terms of the particular plaintiff's diligence in overcoming the resulting barriers.

Thus the Supreme Court excused a delay spent in an attempt to obtain reinstatement through Congress, Myers v. United States, 272 U.S. 52, 106–107, 47 S.Ct. 21, 71 L.Ed. 160 (1926) (14 months), and this court has excused delays caused by reasonable mistakes as to the proper procedure, Ritter v. Strauss, 104 U.S.App.D.C. 301, 306, 261 F.2d 767, 772 (1958) (14 months), and as to the applicable rule of law, Duncan v. Summerfield, *supra* (32 months). It would be anomalous to give any less consideration to the diligent poor. In fact, this court has recognized that a litigant's poverty may create difficulties justifying his delay in bringing suit. In Gurley v. Wilson, 99 U.S.App.D.C. 336, 239 F.2d 957 (1956), plaintiff improperly brought suit in California to secure reinstatement. A year later, the suit was dismissed on the ground that jurisdiction was in the District of Columbia. Another year went by before suit was filed here, and the Government claimed laches. The District Court granted summary judgment on that ground, and we reversed, relying exclusively on plaintiff's uncontroverted affidavit that he had no money when his California suit was dismissed, "but as soon as he could save enough money to travel to Washington he did so and worked here until he saved the amount required to bring the present action." On these facts, we found Gurley "sufficiently diligent." 99 U.S.App.D.C. at 338, 239 F.2d at 959 (on petition for rehearing).

The claim that in this day and age poor people have no excuse for not obtaining counsel rapidly is simply nonsense. We are getting better at supplying legal aid to the poor. We are, it is true, gradually eliminating the disparities between the ideals and the realities of our system of justice. But the situation is far from tolerable. The poor often are ignorant of their rights, and alienated from those

---

2. Leggett v. Standard Oil Co., 149 U.S. 287, 294, 13 S.Ct. 902, 37 L.Ed. 737 (1893) (14–15 years); Washington v. Opie, 145 U.S. 214, 12 S.Ct. 822, 36 L.Ed. 680 (1892) (15 years); Gillons v. Shell Co. of Calif., 9 Cir., 86 F.2d 600 (1936), cert. denied, 302 U.S. 689, 58 S.Ct. 9, 82 L.Ed. 532 (1937) (9 years); Levis v. Kengla, 8 App.D.C. 230 (1896) (15 years); Naddo v. Bardon, 8 Cir., 51 F. 493 (1892) (17 years); De Estrada v. San Felipe Land & Water Co., C.C.S.D. Cal., 46 F. 280 (1891) (14 years); Landell v. Northern Pac. Ry. Co., D.D.C., 122 F.Supp. 253 (1954), aff'd, 96 U.S. App.D.C. 24, 223 F.2d 316, cert. denied, 350 U.S. 844, 76 S.Ct. 85, 100 L.Ed. 752 (1955) (over 50 years).

3. *E. g.,* Washington v. Opie, *supra* Note 2 (lawyer plaintiff claimed he could not afford lawyer); Davis v. Tennessee Valley Authority, N.D.Ala., 214 F.Supp. 229 (1962), aff'd, 5 Cir., 313 F.2d 959, cert. denied, 375 U.S. 818, 84 S.Ct. 53, 11 L.Ed.2d 52 (1963) (questionable proof of poverty did not explain 20 months of 43 months delay); Wolf Minerals Process Corp. v. Minerals Separation No. Am. Corp., 4 Cir., 18 F.2d 483, 490 (1927) ("Wolf pleads poverty, but we are not convinced by the evidence that delay in instituting suit was due solely to this cause.")

4. *E. g.,* De Estrada v. San Felipe Land & Water Co., *supra* Note 2, 46 F. at 282.

assigned to dole out justice.[5] We need not decide, however, whether the apathy apparently inherent in the condition of poverty deserves judicial notice. Appellant has not been apathetic. He was at all times diligent in exhausting administrative remedies. After further appeal to the Civil Service Commission was denied in April 1963, appellant and his father made numerous attempts to secure legal assistance from individual attorneys, legal aid agencies, and the San Francisco Bar Association's Lawyer Referral Service. No attempt has been made to controvert appellant's proof in this regard. Some of the attorneys contacted apparently considered the case meritless, others wanted cash in advance. The legal aid agencies contacted had too large a backlog of cases. It was only in April 1964 that present counsel was found through another lawyer. He proposed a fee schedule and, after three months of trying to raise money, appellant's father made a counter proposal which was accepted. Present counsel was formally retained on July 27, 1964. The complaint in this action was filed in August.

■■ Appellant, therefore, is not a person who has slept on his rights. The District Court, apparently prepared to regret his poverty, was unprepared to recognize its consequences. The suggestion that recognizing it as possibly justifying delay would be "an invidious mistake" is reminiscent of Anatole France's biting comment that "The law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread." Quoted by Justice Frankfurter in Griffin v. People of State of Illinois, 351 U.S. 12, 23, 76 S.Ct. 585, 593, 100 L.Ed. 891 (1956) (concurring opinion). The law need not be so blind. If poverty creates a barrier to litigation in particular cases, a court, in applying the equitable doctrine of laches, must open its eyes to this fact. If, as in this case, the evidence reveals diligence on plaintiff's part in attempting to overcome the barrier, then he has not slept on his rights and laches should be denied.

■■ Even if some unnecessary delay were shown to exist in this case, before holding the suit barred by laches the Government would be required to demonstrate prejudice caused by the delay. The only prejudice allegedly caused is, according to the District Court, "inherent in situations like the case at bar," namely the Government's "right" to have its operations disturbed as little as possible by reinstatement and by having to pay the salaries of two persons for a single service. The prejudice normally contemplated in applying laches, however, stems from such factors as loss of evidence and unavailability of witnesses, which diminish a defendant's chances of success. *E. g.*, Levis v. Kengla, *supra* Note 2, 8 App.D.C. at 238–239.

■■ Of course, laches serves other purposes collaterally, if not directly, including minimization of the disruption and expense caused by affording certain relief. But United States ex rel. Arant v. Lane, 249 U.S. 367, 39 S.Ct. 293, 63 L.Ed. 650 (1919), which highlights these interests and upon which the District Court relied heavily, does not give the broad authority supposed. In *Arant,* petitioner waited two years before bringing suit and the Court pointed out that "[s]uch a long delay must necessarily result in changes in the branch of service to which he is attached and in such an accumulation of unearned salary that, *when unexplained,* the manifest inequity which would result from reinstating

5. See generally, *e. g.*, Cahn & Cahn, *The War on Poverty: A Civilian Perspective*, 73 Yale L.J. 1317 (1964); Carlin & Howard, *Legal Representation and Class Justice*, 12 U.C.L.A.L.Rev. 381 (1965); Note, 40 N.Y.U.L.Rev. 948–954 (1965). For a comprehensive treatment of the problem of providing legal assistance to the poor, and of the need for such assistance, see Judge Raymond P. Alexander's remarkable opinion, *In re Community Legal Services, Inc.*, No. 4686, Pa.Ct.Com.Pl., June 30, 1966, printed in 155 Legal Intelligencer 1 (July 1, 1966), summarized in 35 U.S.L.Week 2017 (1966).

him, renders the application of the doctrine of laches to his case peculiarly appropriate in the interests of justice and sound public policy." *Id.* at 372, 39 S. Ct. at 294. (Emphasis added.) Here the shorter delay was explained, so prejudice could not be presumed. And the Government has made no showing that appellant's position was kept open for a reasonable time and then filled, see Duncan v. Summerfield, *supra,* 102 U.S.App. D.C. at 186–187, 251 F.2d at 897–898, or that his reinstatement would disrupt the Government service, Gurley v. Wilson, *supra,* 99 U.S.App.D.C. at 338, 239 F.2d at 959. Appellant has not specifically requested back pay. If and when he does, that issue might be judged by a different standard. See Norris v. United States, *supra* Note 1; Gurley v. Wilson, *supra;* Ritter v. Strauss, *supra,* 104 U.S. App.D.C. at 306, 261 F.2d at 772.

## II

We turn then to the circumstances which led to appellant's discharge. The facts are undisputed. While employed by the Air Force in Japan, appellant resided with his family at an off-base private dwelling. Armed with a Japanese search warrant obtained pursuant to a request by the Air Force Office of Special Investigations (OSI), OSI agents and Japanese officers searched appellant's home. The search was a general one, the Japanese warrant reciting that objects to be seized in the search included: "Typewriters, United States property, official documents, memos, diary,

documents, everything in relation to this case." The record shows that the OSI agents went through "literally thousands" of appellant's private papers, including letters from his deceased mother, and seized, among other things, his personal typewriter, a copy of a letter he had written to Phoenix University in Italy, a letter he had written to a base concessionaire, and a quantity of firearms and ammunition.

Five charges were pressed against appellant: (1) furnishing misleading information pertaining to his educational qualifications; (2) fraudulently using the name of a law firm to avoid payment of a debt; (3) unlawful possession of firearms; (4) driving while intoxicated and using threatening language to an Air Police Officer; and (5) engaging in outside business without prior approval. The fourth charge was properly proved, but under Air Force regulations it is not an offense for which the penalty of discharge may be assessed. See AFM 40–1, AF C–2, §§ 1–19.

 The first and third charges were proved by evidence or affidavits based on evidence seized from appellant's home. Appellant's counsel clearly objected to the introduction of a letter to prove the first charge, on the ground that the search and seizure were unlawful.[6] No specific objection was made at the time certain firearms were introduced to prove the third charge, but appellant had objected to the search and seizure on at least two occasions prior to the hearing

---

6. APPELLANT'S COUNSEL: * * * I shall most strenuously object to Major Hopson seeking to ask you to accept this product of what I respectfully submit is obviously illegal search and seizure. Major Hopson is going to smile and say that this is not a court proceeding. I am again going to appeal to your fairness. You can take anything you want to, but there are certain fundamental, basic rights involved that even a murderer and rapist is supposed to have.

 * * * * *

CHAIRMAN: Mr. Oppenheim objected to this letter being introduced. He says that this letter was obtained under an illegal search.

APPELLANT'S COUNSEL: And seizure.
 * * *

 * * * * *

* * * I don't care what kind of a hearing this is or what kind of rules of evidence is applicable. It is a group of Americans. There are certain basic American fundamental rights. I respectfully submit that these should not be ignored by this committee or anyone else. The Supreme Court, and the Court of Military Appeals and everything else states that nothing that is illegally seized should be presented. Believe me, I am not waiving [*sic*] a flag. This goes to the fundamentals of our whole thing.

**640**

and once more during the hearing, when the letter had been offered. Under these circumstances the prior objection sufficed to preserve the issue. See Sanchez v. United States, 8 Cir., 293 F.2d 260, 264–265 (1961); 1 WIGMORE, EVIDENCE § 18, at 331 (3d ed. 1940).

▮ On the legality of the search we think it clear, and the Government does not argue otherwise, that the Fourth Amendment is violated by a general search such as the one in this case. That amendment specifically provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the * * * things to be seized." Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927); Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921). And when Section 14 of the Veterans Preference Act, 5 U.S.C. § 863, refers to "evidence submitted" in employee discharge proceedings, it means evidence submitted without violating the Constitution of the United States. For "nothing short of the most explicit language would induce us to attribute to Congress" an intention "to authorize one of its subordinate agencies to sweep all our traditions into the fire * * * and to direct fishing expeditions into private papers on the possibility that they may disclose evidence of crime." Mr. Justice Holmes speaking for a unanimous Court in F.T.C. v. American Tobacco Co., 264 U.S. 298, 305–306, 44 S.Ct. 336, 337, 68 L.Ed. 696 (1924).

It would seem wholly at odds with our traditions to allow the admission of evidence illegally seized by Government agents in discharge proceedings, which the Court has analogized to proceedings that "involve the imposition of criminal sanctions * * *." Peters v. Hobby, 349 U.S. 331, 344, 75 S.Ct. 790, 797, 99 L.Ed. 1129 (1955); Greene v. McElroy, 360 U.S. 474, 496–497, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L. Ed. 746 (1886), the source of much of our present law of search and seizure,

was itself a forfeiture proceeding, which at most can be termed "quasi-criminal." Almost on all fours with this case, and in accord with our result, is Saylor v. United States, 35 U.S.L. WEEK 2006 (Ct.Clms. June 15, 1966) (recommended decision of Commissioner Day), holding that evidence illegally seized by military authorities cannot be used as a basis for discharging a civilian employee in Japan, despite the absence of any objection to its introduction.

▮ The Government's position is that the search was made lawful by paragraph 6(a), Article XVII, Agreement under Article VI of the Treaty of Mutual Cooperation and Security, 11 U.S.T. 1665, which provides:

"The military authorities of the United States and the authorities of Japan shall assist each other in the carrying out of all necessary investigations into offenses, and in the collection and production of evidence, including the seizure and, in proper cases, the handing over of objects connected with an offense."

This, appellee contends, made lawful the presence of Air Force agents "as observers during the execution of a valid Japanese search warrant for appellant's off-base residence." "The obvious and decisive answer to this, of course, is that no agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution." Reid v. Covert, 354 U.S. 1, 16, 77 S.Ct. 1222, 1230, 1 L.Ed.2d 1148 (1957) (opinion of Black, J.). And in any case, the record conclusively demonstrates that OSI agents requested the search and actually conducted it. (J.A. 84–85.)

▮ The second and fifth charges were proved in part by the affidavit of Miss Muira, in violation of Air Force regulations covering discharge hearings which provide that the employee has "the right to question any person * * who testifies at the hearing," AFM 40–1, AF A–12.5, § 5, para. 4(a), and that such employees "will be supplied with a

list of the witnesses," AFM 40–1, AF A–12.5, § 5, para. 3a(2). It is true that the regulations further provide that if a witness is unavailable a signed statement may be received in lieu of live testimony. But here the record affirmatively suggests that no effort whatever was made to produce her.[7] Williams v. Zuckert, 371 U.S. 531, 372 U.S. 765, 83 S.Ct. 1102, 10 L.Ed.2d 136 (1963), is inapplicable to this case; appellant could not have requested in advance Miss Muira's presence at the hearing, since the Government did not inform him she would be used. When her affidavit was offered, strenuous objection was made. *Supra* Note 7. Thus, insofar as appellant's discharge was based on charges supported by this evidence, his removal was invalid. Vitarelli v. Seaton, 359 U.S. 535, 545, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959).

■ It is true that appellant did not clearly articulate his search-and-seizure and right-to-confrontation objections in the proceedings before the Civil Service Commission, where he was acting *pro se*. But the Air Force hearing transcript was part of the appeal file, the Appeal Examiner considered it and even ruled that the documents taken from appellant's residence were within the scope of the search warrant (J.A. 183), and the chairman of the Board of Appeals and Review ruled on the basis of "a thorough review of the entire appellate record." (J.A. 152.) In fact, when appellant sought to appeal the BAR's adverse decision on grounds of denial of confrontation he was told, in effect, that this matter had been considered, as the "decision was based upon an evaluation of all pertinent information of record * * *." (J.A. 144.) Under the circumstances, appellant has exhausted administrative remedies, and since the sole valid charge against him is insufficient to sustain a discharge, this case is remanded to the District Court with instructions to remand to the Air Force for further proceedings not inconsistent with this opinion.

So ordered.

7. The record shows:
Q Was a statement obtained from Miss Muira?
A Yes, sir.
Q Do you have that statement in your possession?
A Yes, sir.
Q Was this statement obtained through the course of the official investigation?
A Yes, sir.
MRC I ask this be marked as Management's Exhibit B-22.
* * * * *
Let the record reflect that a five-page handwritten statement has been marked Exhibit B-22, now being shown to counsel for the appellant.
* * * * *
Mr. Chairman, I know that you are aware of this and I am sure the counsel ·for the appellant is. There is no one on earth we can bring in, or no way we can bring in a Japanese National to the board meeting. As I understand it, there is no way we can get anyone to come in unless they agree.
CHAIRMAN To clarify for the record. We can request that they come in. In terms of the members of the U.S. Forces, we can request and we can always indicate at that time that the person's duty is to make an appearance. Of course, when a person makes an appearance, it is not always possible to get a man to testify completely. He may or may not answer the question. With Japanese, we can only request their appearance.
APPELLANT'S COUNSEL This I understand. But I suggest that this young lady was not invited to come.
MRC I only want to point out, for the record, that since the 31st of January, the aggrieved has had occasion to call any witnesses he wants to call.
* * * * *
CHAIRMAN You prefer to have Miss Muira brought in as a witness?
APPELLANT'S COUNSEL Of course. She is the best evidence.
CHAIRMAN The committee has considered the request of Mr. Oppenheim and determined that they will accept as evidence this statement of witness Miss Muira and it will not be necessary for her to appear as a witness.